United States v. Hatley Good morning, your honors. Good morning. I know it's Wednesday. I have to be a little excited today. My name is Donald Washington. I'm with the law firm Jones-Walker. I will fully disclose to Judge Reveley that, although I live in Louisiana, I grew up in Sulphur Springs, Texas, and I hope you won't hold anything against me that the Sulphur Springs Wildcats may have done to the Quitman Bulldogs. I also confess that I'm not a Harvard graduate. I didn't go to the University of Texas. But I do have the great pleasure of representing Jeremy Hatley. It's an honor to represent Jeremy Hatley. I'll speak briefly about him and then get to the issues. Mr. Hatley is a father. He's the husband of Lauren. He has three children, the youngest of whom is very ill. Mr. Hatley served his country. She had sweat in Iraq and Afghanistan. And she had blood at the hands of a Taliban sniper in Afghanistan. Mr. Hatley, however, ended up in a place in April 2011 that has caused us to be here today. And that place is the Iberia Parish Jail under the control of Sheriff Lewis Ackle. He was there because he was a dog handler. His job was to help the other officers conduct a sweep, sometimes called a shakedown, of the parish jail. He was sweeping for weapons, drugs, shanks, and things of that sort. At the end of the day, Mr. Hatley's dog needed a rest. And so he took the dog into the chapel at the jail and rested. While resting, other things began to happen in the chapel. At least one inmate was brought into the chapel and abused, seriously abused by other deputies belonging to the then narcotics unit. Fast forward from April 2011 to December of 2015, almost five years later. The United States government is investigating the allegations that have been made against Sheriff Ackle and his officers at that jail on that evening in April 2011. They got to Mr. Hatley and they asked him a question. Mr. Hatley went over voluntarily without counsel. And the final question after an hour or so of interviews was, so are you telling us that you didn't see anything happen that was against the law that violated someone's civil rights in April 2011? Mr. Hatley, unfortunately, said, that's correct. That's what I'm telling you. That was a false statement in December 2015. A few days later, Mr. Hatley called the FBI up and said, hey, I made a mistake. I said something wrong. You said a few days. I'm recalling, was it 30 days later? No, sir. The actual phone call, and this is, of course, the basis for trying to get access to the 302s. The actual phone call to the FBI agent was a few days later. I say a few days. It could have been two weeks, but no more than that, I don't believe. And he told the FBI that he needed to come back and talk to them and tell them and set the record straight. He then acquired counsel, me, and then we went over to the FBI office and met with members of the Department of Justice as well. That's the 30 days. It was within that 30 days that Mr. Hatley and I went back over to the FBI's office and corrected the record. And so why are we here? The 302s, were they asked for earlier, or they only got asked for in the appeal? That's correct, and the reasoning for that is pretty simple, I think. Perhaps I should have had more foresight, but this was a plea agreement. We didn't go to trial, so there was no exchange of discovery. By the time we pled, there was no need to exchange discovery. We entered into a plea that was pretty simple. It said that I saw something in the chapel that I should have reacted on. That, of course, led to a misdemeanor civil rights charge. And it also said, the plea agreement also said that, oh, by the way, I made a false statement about that four years later, and so I'm charged for that as well. So that's the 18 U.S.C. 1001 charge. So at the end of the day, we went through the usual things after the guilty plea, and eventually a hearing was set for sentencing. On the day that the hearing was set for sentencing, I think a total of seven defendants associated with Sheriff Ackle were sentenced that day. You're going to hear the next case, U.S. v. Broussard, is one of those cases as well. And so during that sentencing, it was, I don't want to mischaracterize this at all, but it was almost a cattle guard type sentencing process. At the end of the day, we had gone through sentencing memorandums. We'd gone through letters of support. We'd gone through other kinds of the objections to the pre-sentence investigation report. And the objections and things of that sort were handled at the sentencing hearing. At the hearing, the presiding judge, who had sat and presided over the Lewis-Ackle case, when it came time to sentence my client, we made our statement, we made our argument. We had argued in the sentencing memorandum that we thought Mr. Hadley should be placed on probation. The judge overruled all of the objections to the PSI, and he made the statement in support of overruling the objections, he made the statement, I remember your testimony at the Ackle trial. And your client did not testify. That is correct. So there was a mix-up in some way. And did you point that out right away? We pointed it out in post-sentencing memoranda. Frankly, I was, I hate to use the word shock, but I didn't think I heard what I heard. And after the hearing was over, I asked some others, including my client. And then we later, of course, got the transcript, and the judge, in fact, said, I remember your testimony from the Ackle trial, and based upon that, and based upon the PSI, I'm going to sentence you to such and such. Mr. Washington, let me ask about that. Did he make a comment like that regarding any of the others? Was he factoring that in explicitly on any of those other numerous defendants? No, sir. No, Your Honor, not at all. Where do you take that to mean? The sheriff was acquitted, as I recall. I certainly don't know what tone of voice the district judge was using. Was that potentially a favorable comment, that he was one of those who agreed to testify against the sheriff in exchange for consideration in his court? If that's what he meant, it seems to me it wasn't harmful to your client that he said that. Well, that perhaps is true, Your Honor. However, I'd take the other side and say it's just as plausible, just as likely, perhaps more likely, that it was just the opposite. And that is, as you well know, the entire transcript of the Actical Trial is a part of the Record on Appeal in this matter. And so once you look at that transcript, you're going to see, and I probably have my numbers incorrect here, but either 11 out of 15 or 15 out of 19 of the witnesses that testified admitted to all kinds of things that they had done. So they were participants. Most of them were participants in the bad acts. All of them except for two were active participants in the bad acts. And not, Your Honor, not just the bad acts of the night of April 29, 2011, but the bad acts of other occasions as well. A lot of stuff came out in the Actical Trial. That they were just abusive all the time. These certain folks were abusive all the time. And I believe that, in answer to Judge Southwick's question, that the judge could easily have had this overlay of stuff, that I call it, that is very negative because if you read the transcript, it is hard to reconcile a not guilty verdict in that trial. There were a lot of things going on in that trial. And so a lot of people came in. But of the three, Your Honor, that were not active participants, they were Mr. Burns, Mr. Hatley, and Mr. Broussard, who were all charged with failing to intervene. Having said that, in my brief, I point out to you that Mr. Burns and Mr. Broussard also laid hands on an inmate at some point in time during the night. Mr. Hatley did not lay hands on anyone. Mr. Hatley's sin was sitting there and doing nothing when he had a duty under the law to do something. Your chart is very helpful in your brief. Thank you, Your Honor. And so what we have here for Mr. Hatley is the core violation is a misdemeanor civil rights violation. Now, I'm a former member of the United States Attorney's Office in western Louisiana. The U.S. Attorney's Office, the Department of Justice, does not likely handle misdemeanors. They handle felonies. When there is a misdemeanor, it is, and I hate to use this term because it is not, and I don't want to leave you with the wrong impression, it's sort of like a speeding ticket to those offices. It is something that is less significant. They agreed in this case to a misdemeanor as the core violation that Mr. Hatley committed. And they have then added on this other violation, which is the false statement, which I'd like to talk about for a moment, because I think here is where the major point is for this argument. The false statement was made again in April 2011, corrected, pardon me, it was made in December 2015, corrected in January 2016. Now, for the core violation, Mr. Hatley received six months. Now, the presiding judge, misdemeanor, could have sentenced him to the full year of statutory maximum, but he got six months. So there was some discretion in there and there was some rationale for that sentence, and that is the same sentence that Mr. Burns got, who was also a dog handler but also put hands on one of the prisoners, one of the inmates. Did your client's dog, was it a participant in this? No, Your Honor. That dog stayed off resting? That is correct. Now, there was one witness who testified, I believe, if I have this right, and you'll see this in the record, that my client's dog barked or was caused to bark at one of the inmates. That witness is Mr. Broussard, who you'll hear from next. Barked but did not, wasn't put upon the? Well, my point to be made is that testimony from Mr. Broussard came as a result of hypnosis and witness or memory reconstruction, as I call it. None of the other witnesses, none of the other active participants, the actual people in the front of the chapel, as if he were here in front of you, with three officers around him, one sitting down here, and then Mr. Hatley and Mr. Broussard back on the fourth pew. At the end of the day, Mr. Hatley's dog and himself were back in the back of the chapel, and so I would submit that anyone who says that, and the only one that I can think of who said that, perhaps of Mr. Broussard, that's the only one. None of the active participants said that. And so what we have on the false statement, though, which I think is the crux of this matter, is that Guidelines 2J.1 and 2B.1.1, 2J.1.2 and 2B.1.1 were confused by the probation officer. 2J.1.2 gives an offense level of 14, 1.1 ends up with an offense level of 6. Now, when we think about a false statement in the context of a misdemeanor violation that yielded six months, is it reasonable, getting to the substantive reasonableness of the matter, is it reasonable that Mr. Hatley would get 30 months? Is it reasonable that the sentencing guidelines would calculate out to 23 offense levels for a false statement when we have a misdemeanor as the base and when, if you look at other guidelines, we end up as a 0 to 6? Well, you know, we can't substitute our judgment on the sentence even if we were to just agree with you. We have case law that says if it's within the guidelines, substantive reasonableness is presumed. Montegon-Santiago for many years has been our law. Yes, ma'am. But the first step in Montegon-Santiago is the concept that there has to be a correct calculation of the guidelines. You'll see my brief. I argue extensively that the guidelines were not correctly calculated. But more importantly, 3553 wasn't mentioned at all in my sentencing. There was none of the phraseology, none of the words. The 18 U.S.C. 3553A was not mentioned at all by the presiding judge. Now, he did so in the other six sentencings that day, but not in mine. I did not get, my client did not get the analysis required in the 3553A for a sentence to be substantively reasonable. And I think that's particularly true to the 30-month sentence for the false statement, which should be, as I argued in my brief, in the 0 to 6 range rather than the 30-month range. Lastly, they should not have been run consecutively. 5G 1.3 makes clear that a judge has to apply at least 3553A for a sentence to run consecutively unless the law mandates that the sentence runs consecutively, which is not the case here. You know, it wasn't pointed out to the district court that your client, on his own, went back to correct the statement in the transcript. It just says he went back to correct it. It doesn't say he called them shortly thereafter and all of that. Do you know, did the PSR talk about that so that the court would have known that? It did not, Your Honor. Because I've got it here, but I just was trying to refresh my recollection. If you look at footnote 5, I think you'll see in my brief that I placed that responsibility on the probation officer because he has a direct duty to review the government's file materials and sort all that out. Okay, and I've got one more question about the 302s. Why do you need that? Because the point of it is to show that he was forthright shortly after he wasn't. What else do you get from that? That's all I need. But you, I don't, is that being contested? I believe so, Your Honor. That he was forthright, so that's going to be a big issue? The time issue, I believe, is very important. Well, it's within 30 days, isn't it? It is from my perspective, yes, and that is the argument that I've made, and it was brought up in some of the other posts in the memoranda as well.  Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Vikram Swaroop on behalf of the United States. Jeremy Hatley's 36-month sentence in this case is reasonable. The sentence was a substantial downward departure from the 63- to 72-month range calculated under the United States sentencing guidelines. I'd like to start by discussing that guideline range. Hatley's principal challenge to the guideline range is that the district court miscalculated the offense level for his Section 242 offense. In making that challenge, Hatley downplays his factual involvement in the offense, the elements of the offense, and he misstates the breadth of the applicable guideline range. As to his involvement in the offense, it's important to remember what Hatley actually pleaded guilty to. He pleaded guilty to violating 18 U.S.C. 242. That's a willful deprivation of rights under color of law. He committed the crime by failing to intervene when a fellow officer, Ben LaSalle, assaulted an inmate repeatedly by striking him with a baton. Hatley admitted that he knew that the beating was going to occur before the beating started. He admits that he had an opportunity to intervene, and he admits that he had a duty to intervene. Nevertheless, he willfully and deliberately chose not to intervene and disregarded his constitutional obligations as an officer to step in and do something about an assault that he was witnessing. It is at least striking, though, that the district judge on that offense sentenced him to six months. Your Honor, in terms of the sentence allocation between the two counts, the sentencing guidelines presume that there is a total punishment imposed to all counts, and the count-by-count allocation is merely a ministerial step at the end of the sentencing process. One's a felony, one's a misdemeanor. What you're talking about now is the misdemeanor. It does seem to me all that factors in. I'm more concerned about how the calculation was done. What are you acknowledging was improperly done by the district judge? We're acknowledging that the offense level, the intermediate step of calculating the offense level for the Section 1001 offense, was incorrect, that the district court should have used the other guideline cross-reference rather than the one it used. We're also acknowledging that the rationale behind the grouping decision may have been erroneous, but neither of those errors matter because those are intermediate steps along the way to calculating the final offense level. So the final offense, when you have multiple counts, the final offense level is driven by the count with the higher offense level, regardless of whether they're grouped or whether they're not grouped under the guidelines. And here, no matter what, the Section 242 offense is going to have the higher offense level, and that's what drove the guidelines range, and that's what would drive the guidelines range in any event here. And the fact that the offense that drove the guidelines range was a misdemeanor is of no moment, as this Court acknowledged in the Lucas decision, citing back to the Seventh Circuit's decision in Griffith. You upheld that. It does seem odd in this case that the six-month sentence is the one that's driving the overall evaluation of whether we can uphold what happened. What about the misstatement by the judge on the testimony? Excuse me, what he meant, whether it's favorable or unfavorable potentially to the defendant, is not on the table. We don't know what he meant. What's the best way to analyze that? And you're here representing the Department of Justice, representing the government, representing the people. That's an error. What's the right way to look at that and the right way to analyze it on the possible effect it would have had, which could have been harmful to the defendant? Your Honor, in our view, the question here is whether there's any evidence that the district court was actually confused about the identity of the defendants here. And the — Well, he knew the name. He knew the facts of what he had done. But it does seem to me there's actual confusion about whether he was one of those who testified at the trial. I disagree with that, Your Honor, because if there was some sort of perception that the district court was confused, either by Mr. Hatley and Mr. Hatley's counsel or the government, somebody would have objected contemporaneously and said, Judge, no. Well, we heard Mr. Washington's explanation of that. That's plausible enough. Are you saying that, in fact, he may have testified? You're not disputing he did not testify. We're not disputing that he did not testify. What we're disputing is whether the judge was actually confused about the identity of the defendants. And based on this record, there is that line in the transcript about your testimony. But if you look at the record as a whole, it's very clear that the district court wasn't actually confused. The district court specifically mentions Hatley's service to his country as it sentences him. That's a unique fact to Hatley. There was only one other defendant who served abroad, and only Hatley made it central to his sentencing arguments. And then the second part of it is that if you look at the sentences across the board, these sentences are reasonable, and it's clear that the district, this is a really complicated case, with a five-day trial, PSRs, 5K motions for most of the defendants, and the district court clearly considered all of the culpability and all of the cooperation and came to a basically sensible sentencing scheme here that all of the sentences fell within or below the guidelines ranges. And the district court's sentences do reflect the relative culpability and cooperation of each defendant looked at as a whole. You know, just last month, though, we had a case where it was not clear whether the judge was mixed up about who the person was. And the name of the case is escaping me. But we sent that back for a re-sentencing. We were going to get clarity, but the judge was no longer on the bench. So we sent that back for a new sentencing when we weren't sure whether the judge had gotten the person mixed up. And we didn't require the defendant to prove that the judge had gotten him mixed up. There was ambiguity in the record, and we sent that back. Yes, Your Honor. In our view, in this case, there is no ambiguity. Well, he says that the guy testified, and he didn't. Yes, Your Honor. It's at least ambiguous. The record as a whole, I think, clears up any such ambiguity between the lack of any contemporaneous objection, the specific reference to Hatley's service to his country, and the overall sentence that has to be looked at in context of all these sentences. Viewed in that light, you know, you see people like Brett Broussard and Ben LaSalle who get much higher sentences, 54-month sentences, because they were, frankly, much more culpable. Let me make one more run at this. You are focusing on whether, in fact, the district judge had overlooked the fact of this person's history, knew he had been a veteran, a lot of good this officer had done in his life, in a relatively brief life so far. But I don't think you can write out of the record that he also thought he was one of those who testified in the trial. Now, it's not the same thing as saying, you know, he didn't know who this defendant was. He knew who this defendant was and knew most of what he was, but he also knew something that wasn't true. And that is something that can't be excised from the record, I think, by your argument. It's just what is the effect of that. It's not the fact that he knew who the fellow was by looking at everything else. I think we have to accept, except in his argument anyway, for you to respond to, we have to accept that the district judge factored in, maybe not to the sentence, but it was something that was in his mind that this was one of those who testified at the trial of the sheriff. Now, what that means, I have no idea whether that would be harmful or helpful to the defendant. But that fact was in the judge's mind. So can you give me a little bit more than just saying the overall picture is he knew who the fellow was? Right. So the inference from the idea that he thought that Hatley testified at the trial, the conclusion to that is that he must have, therefore, confused Hatley for another defendant who did testify at the ACL trial. And the record as a whole, viewed as a whole, does not at all suggest that the district court confused Hatley for somebody else. When he says your testimony at the ACL trial, the inference that the defendant is trying to draw from that is that the district court thought that Hatley was one of the other defendants. And there's just no, viewed as a whole, I just don't think you can reach that conclusion based on the rest of what the district court did, both in this case and the rest of the cases. You can move on. I'll note that as to the district court's other reasoning, all of that is before the court on plain error review. There were no contemporaneous objections to the district court's explanation of its sentence, and this court has repeatedly upheld the level of reasoning present here. Now, I know you're very picky about the Mondragon-Santiago point, from their side that they didn't object, and with reasonable sentence, what we've talked about. But that case also says that they're supposed to articulate the factors and go through them. And that's why there is the presumption. And this sentencing transcript doesn't show that, does it? Your Honor, the court does cite several of the factors, as well as this idea that the district court didn't cite 18 U.S.C. 3553A. The court references the Sentencing Reform Act, which is the name of the statute. It says pursuant to the Sentencing Reform Act, which is just the name of 18 U.S.C. Pursuant to, but he doesn't really, this doesn't read like a normal sentencing transcript. I mean, we see tons of these. Right. The court goes on to discuss several of the factors, as you see in the transcript, such as his history, characteristics, involvement in the offense, the 5K motion, and his service to his country, all of which are relevant to the 3553 analysis. And then in the cases that we cited in our brief, Sharp and Salazar-Garcia, this court has upheld circumstances where the court calculates the guideline range, adopts the factual findings of the PSR, and then describes some of the factors that it considered. And it's important here that the court considered a whole volume of information, such as a trial testimony that it sat through a five-day trial. It had before it the 5K motions and the PSRs of all of these defendants. It understood their relative culpability and cooperation. And so the consideration of the factors, both on the text of the sentencing transcript, is sufficient under this Court's case law, under unplanar review, as well as the substance of it is sufficient in light of the record as a whole. In terms of the Section 1001 offense, and we don't dispute that he did correct the statement 30 days later. We do dispute the idea that he came to this on his own or anything like that, because if this issue had been raised before the district court, we would have developed our own record explaining why it is that we charged him with 1001. And it's important to remember that he pleaded guilty to violating the statute, which requires a material false statement. So it is material to the investigation. And as well as a specific intent to, it's a willfulness, mental mens rea standard. So he did have the specific intent to deceive the FBI. And he admitted to this as part of his guilty plea. So the idea that he was just sort of innocently forgot something and then misstated it because it was five years later, that's not a 1001 violation. A 1001 violation is a willful material false statement, which is what he actually pleaded guilty to. The probation officer had access to the 302s? My understanding is that the probation officer did have access to the 302s. They could have seen them? If he had requested the documents, that could have been litigated before the district court. Wouldn't that have needed to be litigated if the probation officer is using it? They're allowed to look at the basis for, at least the lawyer is allowed to look at the basis for what's going into the PSR. They may well have prevailed on that issue, Your Honor. Are you saying they're not allowed to look at the basis of the PSR? My understanding is that the U.S. Attorney's Office in the Western District of Louisiana generally does not turn over 302s when there's a guilty plea. Well, if they're using them for the PSR. Nothing from that was incorporated into the PSR here. But again, it wasn't litigated before the district court. And they very well might have prevailed or we might have taken a different position, depending on what exactly he requested and what the basis was for it, and whether it was only going to the counsel as opposed to the defendant, et cetera, et cetera. But here, you know, one of the things is that this is a complex investigation and it's still ongoing, which is why there's the, which also goes to the 5K issue of, you know, how the defendant contends that the district court didn't explain the 5K downward departure sufficiently. And, you know, the 5Ks were under seal before the district court. And if the defendant had objected, perhaps the district court could have provided more explanation in closed court or something like that. But the district court was prudent in not going into too much detail about it, because this is an ongoing investigation with multiple defendants and it's still, and each of the 5K motions was individualized to each defendant based on their cooperation. So it contained a great deal of detail about what information each defendant provided to the government, when they provided it, how it was used, and so forth. Counsel, there are multiple errors in the sentence, some of which you concede, even though you argue that they're harmless. There are multiple errors in the sentence. There's perhaps ambiguity regarding whether or not this person is mixed up, the judge is mixed up about who the person is. Why wouldn't we send this back just because of the cumulative effect of all of this together in the interest of justice, as you were the pursuer of justice? Your Honor, the error, there's only one error in our view, which is the calculation of the 1001 offense level. And that's an intermediate step in the calculation of the guidelines. I thought there were two. The grouping issue is. There are two in the process of calculating. So go ahead and finish whether there's one or two. None of those errors ultimately affected the ultimate guidelines range, which is the ultimate guideline range is the starting point where this Court's review starts. The Court's review over the intermediate steps, this Court doesn't review the intermediate steps as long as the ultimate guidelines range was correct. And here the ultimate guideline range was driven by the Section 242 offense. It was correctly calculated, the 63 to 72 months. And then he received a substantial downward departure from that 63 at the bottom of the guideline range. He got a substantial downward departure. It's unusual to have a defendant who pleaded guilty, got a substantial downward departure, challenge both the substantive and procedural reasonableness of the sentence. It's also worth remembering here that he was a supervisor. He didn't have direct supervisory authority over Ben LaSalle, the individual who repeatedly struck the pretrial detainee here. That was Brett Broussard. But he was a supervisor. So he wasn't a minor player. He wasn't just in the wrong place at the wrong time. There's extensive testimony at the Apple trial about how he was part of this group of defendants. Ben LaSalle testifies that Hatley was part of the group. Broussard testified that Hatley was a good friend who was in the know. And so this is a long-lasting series of abuses at the sheriff's office, and Hatley was a part of it. There's testimony that he walked into the chapel following Broussard, LaSalle, and the officers who had had the conversation about where in the jail there was no cameras. And he admits in his factual stipulation that he knew before the beating began that what was going to happen. And he admits that he had an opportunity to do something about it. He admits that he had a duty to do something about it, and he willfully chose not to. So his brief suggests that he was just sort of in the wrong place at the wrong time when something went awry. That is not supported by either his own guilty plea or by the full factual record in this case. We'll ask that you affirm this sentence, which is a substantial downward departure from the correctly calculated guideline range. Thank you, Your Honors. Just intermediate steps. Just a little bit of this and just a little bit of that. You know, Mr. Hatley, like the rest of us, deserved a little more than that. You know, we're talking about whether the error is harmless or not. How can it be harmless error when a judge may have mistaken in the person that he's sentencing? How can that possibly be harmless error? At the end of the day, there is no doubt, the counsel just agreed, that the judge said, I remember your testimony from the Ackle trial. How can that possibly be harmless if Mr. Hatley did not testify at the Ackle trial? How could that possibly have not affected his substantial rights? How could that possibly have not, if the public would understand that, how could they not bring disrepute upon this institution? And there were other things stated as well. Some things I consider to be errors from counsel. Mr. Hatley was a supervisor, he said, but not the supervisor over the folks who were doing the beating. That's a huge distinction, because in the cases cited by counsel, Reese, Coon, and Serrato, all of those cases involved supervisors who were supervising the people who were doing the beating. Mr. Hatley supervised, if anybody at all, Mr. Burns. Mr. Burns' testimony, when you read the transcript, indicates that Mr. Hatley wasn't even in the chapel. He has no memory of Mr. Hatley being in the chapel while S.S., the guy we're talking about here today, was being abused. Now, he says that Mr. Hatley wasn't a minor player. Well, gee, a misdemeanor is what the United States Department of Justice eventually agreed to. It's not a felony. Everyone else other than Burns received felonies for their conduct. He said that there was testimony that Mr. Hatley walked into the chapel with Mr. Broussard. There was also testimony that he wasn't even in the chapel. There is also no testimony that any of the people who were doing the actual abusing recognized that Mr. Hatley was even in the chapel or heard Mr. Hatley say anything whatsoever. Except Mr. Broussard. Yes, ma'am. Didn't he testify that, or isn't that the truth? Except for Mr. Broussard, that is correct. And, of course, we've already gone over that with the hypnosis and the memory reconstruction. At the end of the day, there are a couple things here that simply smell. One of which is the idea that the judge may have been confused. The second of which is the idea that the 3553A factors were not analyzed in this case. There is no reference to them whatsoever. Oh, but there is a mention of the Sentencing Reform Act, that's enough. Is that really enough to meet constitutional scrutiny? I would argue not even close. If you're going to be sentenced, if we're going to take someone's liberty away from them, we need to state reasons for that. And that's why 3553A, and I know I'm preaching to the choir, that's why 3553A lays out the factors to be considered. Not one of those factors was mentioned at Mr. Hatley's sentencing. Well, that's not, the military is a factor, and he said it. Well, that goes into one of the, yes, you're right, Your Honor. So that's a little overstatement. Yeah, and I apologize, and I don't intend to overstate. What I do intend to mean, though, is that I think there's something more that's demanded here than four sentences at the end of a colloquy made by the defendant. I think the Constitution, I think the 18 United States Code 3553A demands more than that. And so at the end of the day, I don't know how even the government can't concede that this particular sentence is unreasonable. You don't get to 23 points for, now, he says that it was an active lie. We pled to a lie. He pled to deceiving the FBI, but he also agreed that that was corrected within 30 days. Now, he inferred that it was me, I suppose, that drug Mr. Hatley over and said, hey, go tell him the truth.  The client makes the decision as to what he wants to do. I will tell you that that is untrue. Mr. Hatley came to me because he had made that statement, because he wanted to correct it. The other thing I would say about that is the FBI is very meticulous in keeping 302s. I believe there is a record of the phone call that Mr. Hatley made to the FBI when he stated, I'd like to come in and talk about this. If there is not, then we've got an agent that's perhaps not doing her job correctly, but I don't think that's the case here. I believe that there is a 302 on that and that counsel has just not been made privy to it. You need to wrap it up, counsel. Thank you, Your Honor. I am done.